**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

ERIC WASHINGTON,
  *Defendant-Appellant.*

No. 04-50431

D.C. No.
CR-02-01215-
WJR-1

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

v.

ERIC WASHINGTON,
  *Defendant-Appellee.*

No. 04-50485

D.C. No.
CR-02-01215-WJR

OPINION

Appeal from the United States District Court
for the Central District of California
William J. Rea, District Judge, Presiding

Argued and Submitted
October 17, 2005—Pasadena, California

Filed September 6, 2006

Before: Procter Hug, Jr., Harry Pregerson, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Hug

10725

**COUNSEL**

Michael J. Treman, Santa Barbara, California, for the appellant/cross-appellee.

Elizabeth R. Yang, Assistant United States Attorney, Organized Crime and Terrorism Section, Los Angeles, California, for the appellee/cross-appellant.

**OPINION**

HUG, Circuit Judge:

On June 5, 2003, a jury convicted Eric Washington of violating 18 U.S.C. § 371 (conspiracy), 18 U.S.C. §§ 2113(a), (d) (armed bank robbery), and 18 U.S.C. § 924(c) (using, carrying, or possessing firearm in furtherance of crime of vio-

lence). On appeal, Washington contends that he is entitled to have his convictions reversed because: 1) the district court improperly admitted into evidence statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); 2) Washington was prejudiced when the judge admitted hearsay into evidence; and 3) Washington was prejudiced as a result of prosecutorial misconduct when the Government, in front of the jury, referred to his custodial status and to the judge's ruling on a suppression motion.

On August 23, 2004, the district court sentenced Washington to seventy-seven months imprisonment for the conspiracy and armed bank robbery convictions. Washington appeals his sentence, claiming that it violated his Sixth Amendment rights. At the same time, the court also sentenced Washington to a five-year consecutive sentence for use of a firearm in violation of 18 U.S.C. § 924(c). The Government cross-appeals this part of the sentence, claiming that Washington should have been sentenced to seven years because there was brandishing of a firearm in furtherance of the armed bank robbery.

We affirm the convictions, vacate the sentences, and remand for resentencing.

## Background

*The Robbery*

On August 1, 2002, Eric Washington met with his co-conspirators, including Andrew Carter, Derrick Lindsey O'Neal and Joe Earl Alexander, to plan an armed bank robbery. According to the trial testimony, the conspirators discussed who would carry guns. The conspirators then drove to the United California Bank in Commerce, California. Three of the conspirators entered and robbed the bank while Washington acted as a lookout. Janett Guizar, a bank employee, testified that one of the robbers pointed a gun at her and ordered her to open a teller drawer. There also was testimony that one

of the robbers pointed a gun at two other bank employees and ordered them to give him the money from their teller drawers. After the robbery, Special Agent Peter Taglioretti of the FBI obtained a videotape from the bank's surveillance cameras and developed multiple photographs of the robbers. Taglioretti contacted the bank employees and presented them with a six-pack of photospreads of the robbers. Guizar identified Washington from a photospread as the lobby lookout. Another witness also identified Washington from the photospread. At trial, Guizar again identified Washington.

*Washington's Post-Arrest Interview*

On November 7, 2002, local police arrested Washington for the robbery of United California Bank. Agent Taglioretti and FBI Special Agent Roberto J. Basteris met Washington upon his arrival at the FBI Westwood office. Taglioretti asked Washington a series of background questions, including his name, date of birth, address, medical condition, gang moniker, and gang affiliation.

Agent Taglioretti then explained to Washington the charges pending against him. Agent Taglioretti also advised Washington about the opportunity to cooperate. Washington responded by asking the agents about the source of their information. When Taglioretti told Washington that there were several people cooperating, Washington asked for more information. Taglioretti then read Washington his *Miranda* rights. Washington responded by saying that he was willing to listen to the agents without an attorney present. Taglioretti wrote "agreed to listen w/o atty present" on an advisement form that Washington then signed and initialed.

Taglioretti then showed Washington photographs of individuals in custody for the bank robbery and explained the information that law enforcement had about the robbery. Washington stated "I can't do no time but I know I am." Taglioretti proceeded to show Washington bank surveillance

photographs, including a photograph of a robber standing outside the bank doors. When viewing one of these photographs, Washington stated: "Anybody can see that's me in the picture." However, when Taglioretti asked Washington if he wanted to talk about his role in the robbery, Washington responded by saying "[t]hat's not me in the picture." Taglioretti commented that the photograph clearly showed Washington, and Washington then grinned and nodded his head in the affirmative.

*Washington's Motion to Suppress*

On February 24, 2003, Washington moved to suppress his post-arrest statements. On May 19, 2003, the district court held a suppression hearing. Washington testified at that hearing. He claimed that he did not say anything to the FBI about the photographs. He also gave conflicting testimony about whether he made any statements after he was advised of his *Miranda* rights. Washington testified that he could not clearly remember the interview because he was under the influence of alcohol and "chronic" at the time of the interview. However, during his testimony, Washington acknowledged that he agreed to listen to the agents after they read him his *Miranda* rights and that he signed a paper which said "agreed to listen without an attorney present."

Taglioretti testified that, before meeting with Washington, he already had been informed of Washington's name, gang moniker, height, weight, and other background information, but needed to ask Washington this information to ensure that law enforcement's information was accurate. He also testified that he did not show Washington the photos until after Washington had agreed to listen to the agents without an attorney present.

The court denied the motion to suppress. The court reasoned that the pre-*Miranda* questions were routine booking questions, that the post-*Miranda* statements were voluntary,

and that Washington had agreed to listen to the agents without an attorney present.

*The Trial*

*Testimony of the Cooperating Witnesses*

During the trial, the Government called two cooperating witnesses, Derrick Lindsey O'Neal and Joe Earl Alexander. Both witnesses had entered into cooperating plea agreements with the Government. Before entering into the cooperating plea agreements, they met with Government representatives and provided information to them, including identifying Washington as one of the bank robbers. At trial, both witnesses testified that Washington had taken part in the robbery with them.

In the course of cross-examining Alexander and O'Neal, defense counsel asked questions suggesting that, because of their plea agreements with the Government, the two men had colluded with each other to make up stories implicating Washington in the bank robbery.

In closing argument, defense counsel argued that the witnesses tried to make their stories mesh. In particular, defense counsel argued that O'Neal changed his story after the plea agreement as a result of discussions with Alexander in the van on the way to the courthouse to enter his plea.

*Testimony of Agent Taglioretti*

At trial, Government counsel asked Taglioretti, "did O'Neal ever identify who, along with himself, robbed the bank in Commerce?" and "Who did he identify?" Defense counsel objected on the basis of hearsay. Government counsel responded that the statements were prior consistent statements and therefore not hearsay. The court overruled the objection. In addition, when Taglioretti testified about his interviews

with Alexander, Government counsel asked Taglioretti whether Alexander had identified who had robbed the bank with him. Defense counsel again objected on hearsay grounds and the judge again overruled the objection. Taglioretti then testified that Alexander had identified Washington as one of the robbers.

During Agent Taglioretti's testimony, defense counsel asked him "And about what time was it that you finally read [Washington] any *Miranda* rights?" The Government objected, stating: "Objection, your Honor. This is a matter we've already litigated, and the Court's already denied the defendants' suppression motion." Defense counsel then responded:

> Your Honor, I'm moving for a mistrial. There's absolutely no reason for this lawyer to stand up in this courtroom and make those kind of representations in this court in front of the jury. It's a clear violation of the Court's rules and its ethics. The fact that this Court ruled on the voluntariness of my client's statement does not take away from the issue of allowing these ladies and gentlemen to make a determination about the voluntariness of it and the accurateness of it. Move for mistrial.

The court denied the motion for a mistrial, but instructed the jury to disregard the suppression ruling.

*Testimony of Latrina Newell*

Washington called his girlfriend, Latrina Newell, as an alibi witness. She testified that she was with Washington on the morning of the robbery. On redirect, defense counsel had the following exchange with Newell:

> Q: Did you call and ask me about coming here to testify so you could tell what happened, and what

happened on the day that Eric was charged in the bank robbery?

A: Yes.

Q: And did you do that way back when he was arrested in November right after he was arrested? Did you get on the phone and call me about coming in to testify?

A: Yes. And I got on the phone with the FBI and I asked him when his court date, and that I will come to court and testify for him.

Q: And did you say all the way back then —

A: Yes, from Day 1 *when he was incarcerated*. Like when they — I was there when he got arrested.

(emphasis added). In response, the prosecutor had the following exchange with Newell on recross-examination:

Q: You know that Mr. Washington, your boyfriend, has been in custody, in prison, for robbing a bank on August 1, 2002; correct?

A: Yeah. I was told by bank robberies [sic].

Q: And you know that he's been in jail for this charge since November; correct?

A: Yes.

Q: In those seven months between the August 1st robbery — I guess November, actually — in the seven months since November till now, you never called the FBI and told them that you knew that Eric could not have robbed that bank, did you?

> A: Yeah. I did talk to the FBIs. I talked to the other ones. I never met them, I met the other FBIs —.

Defense counsel never objected to these questions.

*The Jury Verdict*

In the jury instructions for armed robbery, the judge instructed the jurors that they must find that "defendants used force and violence or intimidation" in taking the bank's money and that the "defendants intentionally made a display of force that reasonably caused Brenda Lopez, or others, to fear bodily harm by using a gun."

The jury convicted Washington of violating 18 U.S.C. § 371 (conspiracy), 18 U.S.C. §§ 2113(a) and (d) (armed bank robbery), and 18 U.S.C. § 924(c) (using, carrying, or possessing firearm in furtherance of crime of violence).

*The Motion for a New Trial*

Washington moved for a new trial on the grounds that the district court erred in admitting hearsay and that the Government engaged in misconduct when it referenced the court's ruling on the motion to suppress and when it referenced Washington's custodial status during the trial. The court denied the motion, concluding that the statements from the cooperating witnesses were prior consistent statements, that there was no prejudice as a result of the Government's reference to the suppression ruling, and that the Government did not commit misconduct when it referenced Washington's custodial status because the defense already had introduced the fact of Washington's incarceration.

*Sentencing*

The district judge sentenced Washington on August 23, 2004. Over Washington's objection, the judge included a two-

level enhancement in the offense level because the robbery was of a financial institution. In addition, although Washington objected, the judge calculated Washington's criminal history category using juvenile adjudications in which Washington had not been afforded a jury trial. Thus, even though Washington had no criminal convictions as an adult, based on juvenile adjudications going back to the age of nine, when Washington stole candy from other children, the judge concluded that Washington had a criminal history category of V. Based on the offense level and the criminal history category of V, the Sentencing Guidelines range was 77-96 months. The judge declined to depart from the Sentencing Guidelines and sentenced Washington to 77 months for the robbery and conspiracy convictions.

Washington and the Government disagreed about the appropriate sentence for his section 924(c) conviction. The Government contended that the judge should sentence Washington to a seven-year minimum sentence for brandishing a firearm. Washington took the position that he should not receive any sentence at all for the section 924(c) conviction because the jury had not found brandishing of a firearm and because the judge, not the jury, found that there was a crime of violence. The Probation Office recommended that the judge sentence Washington to a five-year sentence for using a firearm because the jury had not found brandishing. The judge sentenced Washington to a five-year consecutive sentence for the section 924(c) conviction. Thus, the judge imposed a total sentence of 137 months.

## Discussion

### I. *Washington's November 7, 2002 Statements and Miranda*

Washington contends that officers obtained his November 7, 2002 statements in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Whether a defendant was constitutionally

entitled to *Miranda* warnings is an issue of law we review *de novo*. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). We also review *de novo* the issue of whether a defendant waived his *Miranda* rights. *United States v. Williams*, 291 F.3d 1180, 1190 (9th Cir. 2002).

**[1]** Once law enforcement officers take suspects into custody, the officers may not interrogate the suspects without first exercising certain procedural safeguards, including informing the suspects of their rights to remain silent and to have an attorney present. *Miranda*, 384 U.S. at 444. There is no question that Washington was in custody at the time he made the statements at issue. The critical question, therefore, is whether the agents subjected him to impermissible interrogation.

**[2]** For police statements to be considered "interrogation," they "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Voluntary statements are not considered the product of interrogation. *Id.* The term "interrogation" means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301. The test is an objective one; the subjective intent of the police is relevant, but not conclusive. *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981).

*A.   The Pre-Miranda Statements*

**[3]** Washington claims that the FBI agents interrogated him when they asked him what his gang moniker was. However, routine gathering of background biographical information, such as identity, age, and address, usually does not constitute interrogation. *United States v. Perez*, 776 F.2d 797, 799 (9th Cir. 1985) (holding that there was no interrogation and that *Miranda* warnings were not required when court asked defendant his true identity because the questioning involved only

routine booking information concerning the defendant's identity), *overruled on other grounds by United States v. Cabaccang*, 332 F.3d 622, 634-35 (9th Cir. 2003)); *Booth*, 669 F.2d at 1238 (concluding that questions relating to defendant's identity and age were not likely to elicit an incriminating response).

The record in the instant case shows that agents routinely obtain gang moniker and gang affiliation information for the United States Marshals and Metropolitan Detention Center in order to ensure prisoner safety. The question regarding Washington's gang moniker therefore was a routine booking question.[1]

Washington argues that the question about his gang moniker was designed to elicit proof that, when the confidential informant stated that "Rock" was involved with the bank robbery, the informant was talking about Washington. Washington therefore claims that the question was designed to elicit incriminating information that would link him to the robbery. Taking Washington's theory to its logical conclusion, any time an informant uses a particular name to identify the person who committed a crime, it would be impermissible interrogation for the police to ask the suspect his name because confirming his identity would be "incriminating." We reject this theory. Asking about a nickname, even if it is for identification purposes, is no different from simply asking for a suspect's name. Questions about a person's identity are not unconstitutional even if identification of the person may help

---

[1]Washington makes much of the fact that the FBI agents already had most of his background information, including his gang moniker, and he contends that the agents therefore had no reason to ask him about such information other than to obtain incriminating admissions from him. However, police routinely confirm booking information such as names and addresses. Indeed, Agent Taglioretti testified that he asked Washington the background questions in order to confirm the information he had. A desire to confirm the information for booking purposes does not mean that the question constitutes interrogation.

lead to the prosecution of that person for a crime. *See California v. Byers*, 402 U.S. 424, 432-33 (1971) (finding no Fifth Amendment violation even though complying with request to identify oneself might provide a link in the chain of evidence needed to prosecute); *cf. United States v. Leal*, 460 F.2d 385, 389 (9th Cir. 1972) ("The identification of oneself is not self-incriminating and thus not protected by the Fifth Amendment.").

**[4]** Police routinely ask suspects their names after being told that the person committed a crime or after otherwise determining that a person is a suspect. Thus, the question about Washington's gang moniker was routine gathering of background information, not interrogation. Therefore, the statements obtained from Washington prior to receiving the *Miranda* warning were admissible.

## B.   The Post-*Miranda Statements*

Washington contends that all of the statements he made after receiving his *Miranda* warnings were inadmissible because the agents obtained the statements in violation of his right to counsel and his right to remain silent.

### 1.   The Right to Counsel

**[5]** A suspect subject to custodial interrogation has the right to consult with an attorney and the right to have an attorney present during questioning. *Miranda*, 384 U.S. at 444. The police must explain this right before questioning begins. *Id.* If a suspect requests counsel at any time during the interview, questioning must stop until the suspect has a lawyer or the suspect reinitiates conversation. *Davis v. United States*, 512 U.S. 452, 458 (1994). If the suspect effectively waives the right to counsel after receiving the *Miranda* warnings, officers are free to question the suspect. *Id*. However, the suspect must actually invoke the right to counsel in order for officers to be barred from questioning the suspect. *Id.* If a suspect merely

makes an equivocal or ambiguous reference to an attorney, this is insufficient to require the cessation of questioning. *Id.* at 459; *United States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005).

**[6]** There is no evidence that Washington asked for an attorney. Washington said that he understood his *Miranda* rights and was willing to listen to the agents without an attorney present. He also signed an advisement form that stated "agreed to listen w/o atty present." There is nothing in these statements that can be construed to be even an ambiguous request for an attorney, much less an unambiguous request for an attorney. Thus, the agents did not violate Washington's right to counsel.

### 2. *The Right to Remain Silent*

**[7]** Washington takes the curious position that the FBI agents should have construed his statement, "I agree to listen," to mean that the agents were not permitted to talk to Washington. A suspect subject to custodial interrogation has the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436 (1966). A person waives the right to remain silent if, after being informed of that right, the person does not invoke that right. *See United States v. Thierman*, 678 F.2d 1331, 1335-36 (9th Cir. 1982) (holding that defendant did not invoke right to remain silent when he asked "Can we talk about it tomorrow?").

**[8]** Washington's statement that he would listen to the agents cannot possibly be construed as a request for the FBI agents not to speak to him or for him to remain silent. He simply did not invoke his right to remain silent. Moreover, even when a defendant has invoked his *Miranda* rights, this does not preclude officers from informing the defendant about evidence against him or about other information that may help him make decisions about how to proceed with his case. *Thierman*, 678 F.2d at 1334 n.3. Thus, it was not a violation

of Washington's rights for the FBI agents to inform him of the evidence against him, and his self-incriminating comments in response were admissible.

## II.  *The Admission of Prior Statements*

During the Government's examination of Agent Taglioretti, he testified that, during an early interview he had with Alexander, Alexander had identified "Rock" as one of the bank robbers. Agent Taglioretti also testified that, during an early meeting he had with O'Neal, O'Neal had named "Rock" as one of the people who robbed the bank with him and had told Agent Taglioretti that "Rock's" true name was Eric Washington. These statements by Alexander and O'Neal were made months before they entered into their cooperating plea agreements with the Government and before they testified in court.

When Agent Taglioretti testified about these statements on the stand, defense counsel objected on hearsay grounds. The Government responded to the objections by arguing that the statements were not hearsay according to Rule 801(d)(1)(B) of the Federal Rules of Evidence because they were prior consistent statements offered to rebut a charge of recent fabrication, improper influence, or motive. The judge overruled the objections.

Whether a district court correctly construed the hearsay rule is a question of law we review *de novo*. *United States v. Alvarez*, 358 F.3d 1194, 1214 (9th Cir. 2004). We review a district court's decision to admit evidence as non-hearsay for an abuse of discretion. *Id.*

**[9]** Rule 801(d)(1)(B) of the Federal Rules of Evidence provides that a statement is not hearsay if the "declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fab-

rication or improper influence or motive." Not all prior consistent statements are admissible. The Supreme Court has made it clear that "the consistent statements must have been made before the alleged influence, or motive to fabricate, arose." *Tome v. United States*, 513 U.S. 150, 158 (1995).

During Alexander's and O'Neal's testimony at the trial, defense counsel did accuse them of recent fabrication, improper influence, and having a motive to lie. In the course of cross examining Alexander and O'Neal, defense counsel asked questions suggesting that, because of their plea agreements with the Government, the two men had colluded with each other to make up stories implicating Washington in the bank robbery.

Defense counsel also asked Alexander and O'Neal about opportunities for collusion. For example, defense counsel questioned O'Neal about the fact that O'Neal spoke to Alexander on January 17, 2003, the day that they entered into their plea agreements. Defense counsel specifically questioned O'Neal about his opportunity to talk to Alexander in the van that transported them between the jail and the courthouse. Similarly, defense counsel questioned Alexander about riding in a van with O'Neal to the courthouse during the trial, but before his testimony. In closing argument, defense counsel argued that the witnesses tried to make their stories mesh. In particular, he argued that O'Neal changed his story after the plea agreement as a result of discussions with Alexander in the van on the way to the courthouse to enter his plea.

[10] Thus, at trial, defense counsel clearly was alleging that a motive to lie and improper influence arose at the time Alexander and O'Neal entered into plea agreements and were presented with an opportunity to collude with each other. The prior consistent statements pre-date this alleged motive to lie and improper influence. Therefore, the district court did not abuse its discretion by admitting the prior consistent statements.

### III.  Prosecutorial Misconduct

#### A.  The Prosecution's Reference to the Suppression Ruling

Washington contends that he is entitled to a new trial because the Government engaged in misconduct when it referred to the district court's denial of Washington's suppression motion in front of the jury. Washington objected to the reference at trial, and the court denied his motion for a mistrial and his subsequent motion for a new trial.

As a general matter, we review claims of prosecutorial misconduct for harmless error when the defendant objects at trial. *United States v. Blueford*, 312 F.3d 962, 973-74 (9th Cir. 2002). When there are allegations of prosecutorial misconduct, we review for an abuse of discretion a trial court's denial of a motion for a mistrial and denial of a motion for a new trial. *United States v. Murillo*, 288 F.3d 1126, 1140 (9th Cir. 2002).

**[11]** The Government concedes that it was error to reference the court's denial of the motion to suppress Washington's post-arrest statements, but contends that the reference did not prejudice Washington. We agree. The Government's reference to the "suppression motion" was vague and not something that a jury would be likely to understand. The Government made no reference to the voluntariness of Washington's statements, much less the reliability or veracity of those statements. It was defense counsel, not the Government, who referred to "voluntariness" and "accurateness" before the jury.

**[12]** Moreover, the judge acted to prevent any prejudice. A judge's prompt corrective action in response to improper comments usually is sufficient to cure any problems arising from such improper comments. *See United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005) (holding that the prosecutor's misconduct in referring to the court's pre-trial ruling was harmless because the court's swift corrective action pre-

vented the prosecutor's improper comments from materially affecting the verdict); *United States v. McChristian*, 47 F.3d 1499, 1507-08 (9th Cir. 1995). When Washington's counsel objected to the Government's reference to the suppression ruling, the judge promptly instructed the jury to disregard the ruling. The judge also instructed the jury that "arguments and statements by attorneys are not evidence" and that "questions and objections by attorneys are not evidence." In addition, the judge provided instructions that made it clear that the jury was responsible for evaluating Washington's post-arrest statements, explicitly telling the jury to decide how much weight to give Washington's statements and to "consider all the evidence about the statements, including the circumstances under which the defendant may have made it." We therefore hold that the error was harmless and the district court did not abuse its discretion by denying Washington a mistrial and a new trial.

B.  *The Prosecution's References to Washington's Custodial Status*

During the trial, defense counsel did not object to the prosecution's reference to Washington's custodial status. We review claims of prosecutorial misconduct for plain error when the defendant fails to object at trial. *United States v. Geston*, 299 F.3d 1130, 1134-35 (9th Cir. 2002). We find plain error only when there is: 1) error; 2) that was clear or obvious; 3) that affected substantial rights; and 4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Vences*, 169 F.3d 611, 613 (9th Cir. 1999).

Washington compares the prosecution's references to his custodial status during Newell's testimony to cases in which defendants were required to wear prison garb during their trials. When defendants are forced to wear prison garb to trial, jurors "may speculate that the accused's pretrial incarceration, although often the result of his inability to raise bail, is

explained by the fact he poses a danger to the community or has a prior criminal record." *Estelle v. Williams*, 425 U.S. 501, 518 (1976) (Brennan J., dissenting). This may create a subtle prejudice undermining the presumption of innocence. *Id.* at 504-05 (majority opinion). The "constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment" and no state policy is served by compelling a defendant to dress in prison clothing before the jury. *Id.*

**[13]** As with prison garb, when a jury is informed that the defendant remained incarcerated while waiting for trial, this can undermine the presumption of innocence. However, the impact of referring to a defendant's incarceration is not constant as it is with prison garb. Moreover, although no state purpose is served by requiring defendants to wear prison garb in front of a jury, in Washington's case there *was* a state purpose for the reference to incarceration. Although Washington claims that the prosecution asked its questions in bad faith solely to place the fact of Washington's pre-trial incarceration before the jury, the record indicates otherwise. There was an obvious and relevant reason why the prosecution mentioned that Washington was in prison; Washington's custodial status provided Newell with an incentive to inform the FBI of Washington's alibi as soon as possible. The logical inference was that, if Newell really had an alibi for Washington, she would have gone to the FBI as soon as possible to make sure that he was exonerated and released from custody immediately. Thus, the reference to the defendant's custodial status is more relevant and less prejudicial[2] than in the prison garb case upon which Washington relies.

---

[2]Washington claims that he was prejudiced because the prosecutor's questions implied that the confinement was for a robbery other than the one at issue in this case. It was clear from the prosecution's questions, however, that the prosecution was referring to an incarceration for the robbery at issue in the instant case; the prosecutor referred to Washington "being in jail for this charge" and the implication of the prosecution's questions was that Newell could help get Washington released from custody if she went to the authorities and provided them with an alibi that would exonerate him from the robbery at issue here.

Moreover, Washington's failure to object to the questions referencing his incarceration undermines his argument that he did not wish for the jury to know about his incarceration. The Supreme Court has concluded that, when a defendant does not make an objection to the court about wearing prison garb, this negates the presumption of compulsion necessary to establish a constitutional violation. *Estelle,* 425 U.S. at 512-13. The Court reasoned, in part, that some prisoners wish to wear prison clothes as a defense tactic designed to elicit sympathy from the jury. *Id.* at 507-08.

In the instant case, it appears that Washington did want to make some use of his custodial status to support his case. In fact, Newell, a defense witness, was the first person to raise the fact of incarceration. The defense sought to use the incarceration to its advantage in order to prove that Newell immediately came forward with an alibi, but the defense now claims that the prosecution was not entitled to use Washington's custodial status to try to demonstrate that she did *not* come forward immediately.

**[14]** As a general rule, prosecutors should not be encouraged to refer to a defendant's custodial status because it may undermine the presumption of innocence. However, given the particular facts of Washington's case, we hold that there was not plain error.

## IV. Sentencing

Relying on the Sixth Amendment, Washington challenges his 77-month sentence for the conspiracy and armed bank robbery convictions. The Government cross-appeals Washington's five-year sentence for the section 924(c) conviction, contending that the sentence should have been seven years because a gun was brandished during the robbery.

We review *de novo* the district court's interpretation of the Sentencing Guidelines. *United States v. Nielsen*, 371 F.3d

574, 582 (9th Cir. 2004). We also review *de novo* the constitutionality of a sentence imposed under the Sentencing Guidelines. *United States v. Toliver*, 351 F.3d 423, 432 n.10 (9th Cir. 2003).

### A.   The Section 924(c) Sentence

At sentencing, Washington took the position that the Sixth Amendment prohibited the imposition of a seven-year sentence for his section 924(c)[3] conviction.

In Washington's case, the jury instructions required the jury to find use of a firearm in furtherance of the bank robbery, but did not require the jury to find brandishing. Based on these jury findings, the mandatory minimum sentence was five years, *see* 18 U.S.C. § 924(c)(1)(A), and the sentence under the Sentencing Guidelines was five years, *see* U.S.S.G. § 2K2.4(b) (2003). According to Washington, imposing a seven-year sentence would have violated the Sixth Amend-

---

[3]Section 924(c)(1)(A) provides:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime —
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A).

ment because the sentence would have subjected him to a sentence higher than the sentence authorized by the jury's verdict.[4]

**[15]** The district court apparently agreed with Washington and sentenced him to a five-year sentence for carrying or using a firearm during a crime of violence rather than a seven-year sentence for brandishing a firearm during a crime of violence. The Government appeals, contending that a seven-year sentence for brandishing a firearm may be based on a judge's finding of brandishing and that the judge erred by imposing only a five-year sentence. We agree with the Government.

In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Court expressly declined to consider the implications of its ruling for cases concerning sentencing guidelines. *Id.* at 497 n.21.A

In *Harris v. United States*, 536 U.S. 545, 551 (2002), the petitioner challenged his seven-year sentence for brandishing a firearm because the question of brandishing had not been charged and submitted to a jury. The Supreme Court began its analysis by holding that the first paragraph of section 924(c)(1)(A) sets out the elements of one complete crime and that the subsequent provision regarding brandishing is one of the sentencing factors for that crime, not an element of the crime. *Id.* at 553-57.

The Court then held that "[b]asing a 2-year increase in the

---

[4]Washington also claims that the reason the district court chose not to impose a seven-year sentence for brandishing was that the judge found that the evidence did not establish brandishing. There is nothing in the record that supports such a characterization of the judge's reasons for not imposing a seven-year sentence. All of the debate about the section 924(c) sentence focused on *Blakely* and Sixth Amendment concerns.

defendant's minimum sentence on a judicial finding of brandishing does not evade the requirements of the Fifth and Sixth Amendments." *Id.* at 568. A four-justice plurality[5] of the Court reasoned that the seven-year sentence did not impermissibly deny the petitioner his right to a jury trial because, although the judge's brandishing finding increased the mandatory minimum sentence from five years to seven years, this did not increase the sentence above the statutory maximum. *Id.* at 557. The plurality determined the maximum sentence by looking only at section 924 itself and did not consider the Sentencing Guidelines.[6] *See id.* at 554. Since the statute itself did not provide a maximum sentence for use or for brandishing, looking only at the statute and not at the Sentencing Guide-

---

[5]Justice Breyer concurred in the judgment because he disagreed with the majority in *Apprendi* and believed that the Sixth Amendment permitted judges to apply sentencing factors based on judge-found facts regardless of whether the resulting sentence was above the statutory maximum sentence or increased the mandatory minimum sentence. *Harris*, 536 U.S. at 570-71 (Breyer, J. concurring in part and concurring in the judgment). Four justices dissented, concluding that the majority's holding conflicted with *Apprendi* because the fact that a defendant brandished a firearm alters the applicable range of penalties. *Harris*, 536 U.S. at 575-76 (Thomas, J. dissenting).

[6]An earlier version of Section 924(c)(1) provided a fixed five-year sentence for using or carrying a firearm. *See* 18 U.S.C. § 924(c)(1) (1994). Thus, the statutory maximum sentence and the statutory minimum sentence for using a firearm were the same. Congress amended the statute to provide the current five-year minimum sentence for using or carrying a firearm, seven-year minimum sentence for brandishing a firearm, and ten-year minimum sentence for discharging a firearm. Pub. L. 105-386, § 1(a)(1) (1998). The revised statute mentions no maximum sentence. *Id.* When section 924(c) was amended, however, Section 2K2.4 of the Sentencing Guidelines then was amended to provide that, for violations of section 924(c), "the guideline sentence is the minimum term of imprisonment required by statute." *U.S. Sentencing Commission Guidelines Manual Appendix C — Volume II Amendment 598 (1998-2002)*. This is how the statute stands today, how it stood when Washington was sentenced, and how it stood when the Supreme Court considered the statute in *Harris.*

lines,[7] the theoretical maximum possible sentence for both use and brandishing was life imprisonment.[8]

In *United States v. Booker*, 543 U.S. 220, 236-44 (2005), the Supreme Court held that it was a violation of the Sixth Amendment right to a jury trial for a judge to sentence someone to a term that exceeded the sentence authorized by the mandatory Sentencing Guidelines and the facts established by a plea of guilty or a jury verdict. In reaching that holding, the Court expressly rejected the argument that, in determining whether a district court impermissibly imposed a sentence above the "statutory maximum," the "statutory maximum" must be determined solely on the basis of the statute prohibiting the criminal conduct and without regard to the Sentencing Guidelines. *Id.* at 238.

**[16]** Washington relies on *Booker* to support his argument that a seven-year sentence would be unconstitutional because the jury did not find brandishing. In Washington's case, however, the Government relied on section 924(c), not U.S.S.G. § 2B3.1(b)(2), to seek an increase in Washington's sentence based on brandishing. As we have recognized, "*Harris* is difficult to reconcile with the Supreme Court's recent Sixth Amendment jurisprudence, but *Harris* has not been overruled." *United States v. Dare*, 425 F.3d 635, 641 (9th Cir. 2005). Therefore, judges still are required to impose higher mandatory minimum sentences for a violation of section 924(c) even if the increase in the sentence is based on facts found by the judge, and even if the mandatory minimum

---

[7]The maximum sentence provided by the applicable Guidelines range would have increased from five years to seven years as a result of finding brandishing. *See* U.S.S.G. § 2K2.4.

[8]When a statute fails to state a maximum sentence, the maximum available sentence under the statute is life. *See United States v. Brame*, 997 F.2d 1426, 1428 (11th Cir. 1993) (statutory provision calling for a sentence of not less than fifteen years authorizes sentence of up to life). This apparently was the reason the Supreme Court concluded that the statutory maximum was life imprisonment.

makes it impossible for the judge to impose a total sentence that the court considers reasonable. *See id.* (affirming the imposition of a zero-month sentence for marijuana possession and a section 924(c) mandatory minimum ten-year sentence rather than a five-year minimum sentence where the district judge found that a drunk man with no criminal history discharged a shotgun in the air after selling a small quantity of marijuana, even though the district judge found the ten-year sentence to be "outrageous").

**[17]** As a result, we hold that the district court in the instant case should have determined if there was brandishing. If the district court finds on remand that there was brandishing, it must impose a minimum seven-year sentence.[9]

## B.   *The Robbery Sentence*

At sentencing, the judge assigned Washington a criminal history category of V, the second-highest criminal history category possible. Washington had no prior adult convictions. If his criminal history category had been based on adult convictions alone, he would have had no criminal history points and would have been in the lowest criminal history category.

---

[9]Washington contends that he cannot be sentenced at all under 924(c) because the judge, not the jury, decided that the bank robbery was a "crime of violence." The categorization of a crime as a "crime of violence" is generally a legal question, not a factual question coming within the purview of *Apprendi*, *Blakely*, or *Booker*. *See United States v. Brown*, 417 F.3d 1077, 1079 (9th Cir. 2005) (assessing categorization of "crime of violence" for career-offender status). The term "crime of violence" is defined by statute. As long as there is no inquiry into the underlying facts and the categorization is instead based on the jury instructions, the jury verdict, and the elements of the relevant crime, *Booker* is not implicated. *United States v. Kortgaard*, 425 F.3d 602, 607-08 (9th Cir. 2005).

Here, the jury instructions and jury verdict for armed robbery clearly fit the definition of "crime of violence" contained in section 924(c). The judge therefore properly instructed the jury that the armed robbery was a crime of violence.

Instead, however, the court calculated Washington's criminal history based on juvenile adjudications going back to when Washington was nine years old and stole candy from other children. With a criminal history category of I, Washington's Guidelines sentencing range for the robbery[10] conviction would have been 41-51 months. U.S. Sentencing Guidelines Manual Sentencing Table (2003). The criminal history category of V significantly increased the sentencing range to 77-96 months. *Id.* The judge sentenced Washington to 77 months, the very bottom of that Guidelines range.

Washington contends that basing his criminal history on his juvenile adjudications violated the Sixth Amendment because his juvenile adjudications were obtained without affording him the right to a jury trial. The Government, however, contends that, after *Booker*, the advisory Guidelines do not provide a maximum sentence for a burglary conviction and therefore cannot raise Sixth Amendment concerns. The Government further claims that the maximum sentence now available for a robbery conviction is the life imprisonment permitted under Section 924(c). Thus, the Government argues, any sentence for robbery that does not provide a sentence greater than life imprisonment is constitutionally permissible even if it is based on juvenile adjudications obtained without a right to a jury trial.

There are several problems with the Government's argument. First, even where judges impose sentences under the advisory Guidelines, there remain significant constitutional constraints on the length of sentences. Sentences must be reasonable, *Booker*, 543 U.S. at 260-61, and sentencing must comply with due process requirements, *Apprendi v. New Jersey*, 530 U.S. 466, 490 n.16 (2000) (questioning constitutionality of a hypothetical statute that exposed every defendant convicted of weapons possession to a maximum sentence

---

[10]The robbery and conspiracy convictions together received one sentence. *See* U.S.S.G. § 3D1.2(a) (2003).

exceeding that which is, in the legislature's judgment, proportional to the crime).

Second, section 924 is a distinct offense from robbery. According to *Harris*, section 924 is a single offense, with brandishing being a sentencing factor for that offense. *Harris v. United States*, 536 U.S. 545, 553-54 (2002). There are separate charges and convictions for robbery and for violating section 924(c). The applicable robbery statute, 18 U.S.C. § 2113(d), provides for a maximum sentence of twenty-five years. There also are separate Sentencing Guidelines applicable to the two crimes. Section 2B3.1(b)(2) of the Sentencing Guidelines applies to the robbery conviction, while section 2K2.4 applies to the section 924(c) conviction. Thus, section 924 does not set the statutory maximum for Washington's robbery sentence.

Third, the Government argues that, since the Guidelines are no longer mandatory, they cannot serve as statutory maxima; therefore, reliance on Washington's juvenile adjudications could not have led to the imposition of a sentence above the maximum authorized sentence. However, when we analyze a judge's sentence, we do so based on the sentencing regime in place at the time of the sentencing. *United States v. Kortgaard*, 425 F.3d 602, 605 (9th Cir. 2005). At the time that Washington was sentenced, the Guidelines were mandatory, so we must examine the court's reliance on the juvenile adjudications in that context. In *United States v. Tighe*, we ruled that "[j]uvenile adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-doubt burden of proof . . . do not fall within *Apprendi*'s 'prior conviction' exception." 266 F.3d 1187, 1194 (9th Cir. 2001). Thus, we held that the sentencing court violated Tighe's Sixth Amendment rights when it increased his sentence beyond the prescribed statutory maximum by relying on a juvenile adjudication that was obtained without affording him the right to a jury trial. *Id.* at 1195.

**[18]** Because *Apprendi*'s prior conviction exception does not apply to juvenile adjudications obtained without the right to a jury trial, it is clear that, in Washington's case, the district court impermissibly relied on such juvenile adjudications to impose a sentence above the maximum sentence authorized by the jury verdict and the mandatory Guidelines in effect at that time.[11]

**[19]** We must consider what sentence the sentencing judge would have imposed if he had known the Guidelines were not mandatory. Following *Booker*, district judges must consider not only the Sentencing Guidelines, but also the other factors set out in 18 U.S.C. § 3553(a), including factors that may not have been relevant under the mandatory Guidelines. *Booker*, 543 U.S. at 245-46; *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006). Where the record does not reveal whether the district judge would have imposed a materially different sentence had it known that the Sentencing Guidelines were advisory, we must remand the case to the district court. *See United States v. Ameline*, 409 F.3d 1073, 1084 (9th Cir. 2005) (en banc). We conclude that, if the district judge had known that the Guidelines were advisory and had taken into account Washington's history, including the details and

---

[11]Washington also claims that it was a violation of the Sixth Amendment for the sentencing judge to add a two-level enhancement because the robbery was of a "financial institution." Sentencing Guideline Section 2B3.1(b)(1) provides for a two-level enhancement in the offense level for robbery if the property of a financial institution was taken. Washington contends that the enhancement was impermissible because the jury did not find that the bank was a financial institution and Washington did not agree that it was a financial institution. Although the jury found Washington guilty of robbing a bank, he claims that this does not necessarily mean that the jury found that the bank was a financial institution.

Count Two of the indictment charged Washington with robbing a federally insured bank. By any definition of a "financial institution," a bank is considered a financial institution. Because the jury found Washington guilty of robbing a bank, it necessarily found that he took money from a financial institution. Therefore, the district court did not err by imposing the enhancement.

nuances concerning the circumstances and conduct resulting in his juvenile adjudications, along with all of the other factors contained in 18 U.S.C. § 3553(a), he may have imposed a materially different sentence. Ordinarily, we would order a limited remand pursuant to *Ameline*. However, because the judge who sentenced Washington is deceased, we vacate the original sentence and remand the case to a new judge for resentencing pursuant to *United States v. Sanders*, 421 F.3d 1044 (9th Cir. 2005).

## Conclusion

The convictions are AFFIRMED. The sentences are VACATED, and the case is REMANDED to a new judge for resentencing consistent with this opinion.