KLEINFELD, Senior Circuit Judge,
dissenting:
I respectfully dissent. The district court’s suppression order should be reversed, and the statements admitted. Two exceptions to Miranda, the “public safety exception” and the “booking exception,” apply. These exceptions make Gilton’s answer to the gang question admissible against him in his criminal trial.
Here is the classification form as filled in for Antonio Gilton, the codefendant at issue:
*1151 [[Image here]]
It is evident from the form that Gilton was already thought to be a gang member by sheriffs department personnel, that he was asked if he was affiliated with “Fillmore/CDP,” and that he answered “Yeah, I hang out there, put me where I’m from.” The acronym “CDP” refers to the Central Divisadero Playas Gang. This answer was incriminating, both on the charges against Gilton for killing and conspiring to kill, and for state gang or federal RICO charges that might subsequently be filed.
Gilton’s answer was obtained and also was valuable for an entirely different purpose, determining where to put him in jail and who should or should not be his roommate. He needed to be transferred from his holding cell to the jail. A “holding cell” is a temporary and often solitary and uncomfortable cell in which people are held for a few hours until they are transferred to jail. A jail is where prisoners are held before trial, if not released on bail, and on short sentences after conviction, typically *1152 for misdemeanors rather than felonies. Gil-ton’s answer, “put me where I’m from,” shows that he understood that his reply would be used as an aid in determining where in jail to put him. He chose to express a preference. His answer appears to be artfully worded; he does not say in so many words that he is a member of the gang, just that he “hang[s] out” with the people in it. Some gangs have “hanga-rounds,” non-members who are. considering and being' considered for membership. Gilton’s declaration in support of his motion to suppress is also artfully worded. He does not say that he would have refused to say that he hung around with the gang and wanted to be placed there, had his Miranda warning been repeated, or had a lawyer been provided.
Two exceptions to inadmissibility apply here, the “public safety exception” and the “routine booking question” exception. Their purposes overlap in this case.
The “public safety exception” allows admission of a defendant’s custodial statements against him in his criminal trial, despite lack of Miranda compliance. This exception is unaffected by whether the question is likely to elicit an incriminating response. The Supreme Court established it in New York v. Quarles.[1] Though the facts are different here, the rationale applies. In Quarles, the police chased a suspected rapist, caught him, frisked him and found an empty holster, and handcuffed him. Then, before Mirandizing him, the police asked him where the gun was. He replied, nodding toward some empty cartons and saying “the gun is over there.”[2] It was. He. was formally placed under arrest, Mirandized, and asked if it was his gun and where he got it. He replied that it was indeed his gun, which he had purchased in Miami. The Court held that the admission he made while cuffed but before getting his Miranda warning, that “the gun is over there,” could not properly be suppressed, despite Miranda.[3]
Quarles held that the statement, “the gun is over there,” was made while the subject was in police custody. Importantly, the officers were no longer concerned for their own physical safety. The Court held that even though the police were not in danger, nor was the suspect still dangerous to others, “there is a ‘public safety' exception to the requirement that Miranda warnings be given.”[4] The gun was hazardous to the public if found by an accomplice, store employee, or store customer. The Court explained this, in terms of “social cost.” The rationale was that Miranda warnings in custodial interrogation were desirable when the social cost was merely fewer convictions, but not when there was the additional social cost such as the danger from the gun. The Court held that “the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment’s privilege against self-incrimination.”[5] The “public safety exception” “will be circumscribed by the exigency which justifies it.”[6] Thus Miranda has no application where exigencies involving public safety justify the question, even though the prophylactic against compelled self incrimination is sacrificed.
*1153 Time mattered in Quarles, because the police wanted to find the gun before someone else did. Time matters here too, because Gilton needed to be safely housed in jail at the time of his transfer from the holding cell. No chase or shooting was going on in Quarles. The only exigency was from the gun, because Quarles knew where he had tossed it and the police , did not. The Court’s explanation, in terms of “social cost,” meant that had the only burden of applying Miranda been suppression of the suspect’s admission at trial, then Miranda would have applied, but the additional “social cost” of danger to the public made the Miranda prophylactic too risky.
That same “social cost” rationale applies to Gilton’s request to “put me where I’m from,” with the people he “hangs around” with. People in jail, are part of the “public.” Some are innocent, some are nonviolent people, there for nonviolent reasons like unpaid fines, and some are extremely dangerous violent criminals and gang members. After confining them and rendering them unable to ' defend themselves, the state owes them a duty to protect them from each other. “California’s other prisoners may be murderers, rapists, drug dealers, and child molesters, but California is responsible for protecting even those sorts of people from murder by other prisoners. Indeed, the Eighth Amendment requires that prison officials ‘must take reasonable measures to guarantee the safety - of the inmates.’”[7] And as the Supreme Court has said, “[L]aw enforcement officers bear a responsibility for ensuring that the custody of an arrestee does not create inordinate ‘risks for facility staff, for the existing detainee population, and for a new detainee.’ ”[8]
A second, independent exception should also be extended to this case, the “booking exception,” The plurality opinion in Pennsylvania v. Muniz[9] holds that routine booking questions to secure biographical data necessary to complete booking or pretrial services are exempt from the Miranda prohibition, so the answers need not be suppressed,[10] The Court distinguished between questions “reasonably related to the police’s administrative concerns” and questions “designed to elicit incriminatory admissions.”[11] Had 'the question about gang membership been "asked of Gilton by someone responsible for prosecuting him, or investigating for his prosecution, it would be “designed to elicit incriminatory admissions.” But it was not. Asked by someone responsible for assigning his housing in jail, as it was, the question was “reasonably related to the police’s administrative concerns.” The administrative concern was safety for Gilton, .and safety for inmates physically accessible to him, while he was in jail.
That Gilton was charged with murder made the need to ascertain gang affiliation especially important for safety. Without the gang knowledge, he could easily have been put in danger from revenge by someone affiliated with the person he had allegedly killed.[12] As the Court explained in *1154 Maryland v. King, knowing “the type of person whom they are detaining” mitigates risks to staff, inmates, and the defendant.[13] In this case, the sheriff’s department already had information about Gilton’s gang status, but it could have been wrong or outdated,[14] and confirming what they thought they knew was important to his and others’ safety.
It would be presumptuous of us to limit the Supreme Court decisions in Quarles and Muniz to their facts, and we have not.[15] In United States v. Carillo we held that under Quarles an officer at a detention facility could ask the in-custody suspect if he had any drugs or needles on his person without Mirandizing him.[16] The officer about to pat the inmate down needed to protect himself from the danger of getting pricked by a needle. “[A] pressing need for haste is not essential” to applicability of Quarles.[17] The question in Carillo might not necessarily have elicited an incriminating response, but it did: “no, I don’t use drugs, I sell them.”[18] We held not merely that the officer could ask the question and use the response to protect himself, as the majority in the case before us now would have held; we held that admission of the answer at trial did not violate Miranda.
Nor have we confined the “booking exception” to the facts in Muniz. We held that the exception applied to asking an inmate being booked what his “gang moniker” was, in United States v. Washington.[19] Asking the inmate his gang moniker is similar to asking his gang affiliation, because a “gang moniker” would signify gang membership. The question was as likely to produce an incriminating response in Washington as the similar question was in this case, because it would imply gang membership, and because the police had evidence that “Rock,” Washington’s gang moniker, was the perpetrator.[20] We nonetheless treated this question, likely to elicit an incriminating response, as a “routine booking question” because gang information is routinely obtained “to ensure prisoner safety.”[21] We should apply Washington and conclude that the gang question in the case before us falls within the “booking exception,” so Miranda does not apply.
The majority relies on four cases for its more restrictive view of the booking exception, Booth, Henley, Matar-Abundiz, and Gonzalez-Sandoval. Not a single one of these cases involves a question during booking. The questions were asked, respectively, on the street,[22] in the police car,[23] in a holding cell by an officer interrogating to prove a crime,[24] and in prison ten *1155 days after booking had occurred.[25] None of these cases is in point.
There is an “objectively reasonable need” to ask about gang affiliation.[26] As the Supreme Court stated, “Jails and prisons ... face grave threats posed by the increasing number of gang members who go through the intake process.”[27] High-ranking gang members are often incarcerated, and direct the gang’s activities both within and without.[28] There is a high likelihood of violence because jails and prisons are fertile recruiting grounds where gang members live in forced proximity to their rivals.[29]
It is important to protect suspects from being compelled to incriminate themselves. It is also important to protect people in jail from violence and death. Gilton, and those from rival gangs, all had a legitimate interest that the jail was obligated to protect in waking up alive in the morning. The deputy served that legitimate and important interest by asking the gang question. Under both the public safety exception and the booking exception, either of which would suffice without the other, Miranda did not apply to the question, and the answer was admissible in Gilton’s prosecution.

. 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

. Id. at 652, 104 S.Ct. 2626.

. Id. at 655-60, 104 S.Ct. 2626.

. Id. at 655, 104 S.Ct. 2626.

. Id. at 657, 104 S.Ct. 2626.

.Id. at 658, 104 S.Ct. 2626.

. Griffin v. Gomez, 741 F.3d 10, 21 (9th Cir.) (quoting Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)), cert. denied sub nom. Griffin v. Beard, — U.S. —, 135 S.Ct. 114, 190 L.Ed.2d 43 (2014).

. Maryland v. King, — U.S.-, 133 S.Ct. 1958, 1972, 186 L.Ed.2d 1 (2013) (quoting Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 132 S.Ct. 1510, 1518, 182 L,Ed.2d 566 (2012)).

. 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).

. Id. at 600, 110 S.Ct. 2638.

. Id. at 601-02 &n. 14, 110 S.Ct. 2638.

. People v. Williams, 56 Cal.4th 165, 152 Cal.Rptr.3d 778, 294 P.3d 1005, 1018 (2013) (victim's brother in the next room says "you’re a dead man”).

. King, 133 S.Ct. at 1971-72.

. See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 132 S.Ct. 1510, 1521, 182 L.Ed.2d 566 (2012) (citing Dep’t of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 752, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989)).

. United States v. Brady, 819 F.2d 884, 888 (9th Cir. 1987).

. 16 F.3d 1046, 1049-50 (9th Cir. 1994).

.Id. at 1050.

. Id. at 1049.

. 462 F.3d 1124, 1132-33 (9th Cir. 2006).

. Id. at 1129, 1133.

. Id. at 1133.

. United States v. Booth, 669 F.2d 1231, 1234 (9th Cir. 1981).

. United States v. Henley, 984 F.2d 1040, 1042 (9th Cir. 1993).

. United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046-47 (9th Cir. 1990).

. United States v. Mata-Abundiz, 717 F.2d 1277, 1280 (9th Cir. 1983) ("Moreover, the questioning conducted by Investigator DeWitt had little, if any, resemblance to routine booking procedures.... [A]ny analogy to routine booking procedures is unwarranted.”).

. New York v. Quarles, 467 U.S. 649, 659 n.8, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); see United States v. Brady, 819 F.2d 884, 888 n.3 (9th Cir. 1987).

. Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 132 S.Ct. 1510, 1518, 182 L.Ed.2d 566 (2012).

. See Griffin v. Gomez, 741 F.3d 10, 22 (9th Cir.), cert. denied sub nom. Griffin v. Beard, — U.S.-, 135 S.Ct. 114, 190 L.Ed.2d 43 (2014).

.Florence, 132 S.Ct. at 1518.