Dissent by Judge KLEINFELD
OPINION
HURWITZ, Circuit Judge:
Antonio Gilton was arrested for murder and promptly invoked his right to an attorney. Hours later, after Gilton was taken from police headquarters to a jail, a sheriffs deputy asked him whether he was a member of a criminal gang. The government seeks to introduce Gilton’s responses to that questioning in its case-in-chief to establish membership in an “enterprise,” an element of the RICO offense for which he is charged. 18 U.S.C. § 1962(c), (d). The district court suppressed Gilton’s statements under the rule of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We affirm.
I.
On the afternoon of July 4, 2012, San Francisco police officers arrested Gilton for the murder of Calvin Sneed. Officers first took Gilton to a local police station; he was transported that evening to an interrogation room at the San Francisco Hall of Justice. At the Hall of Justice, a homicide inspector advised Gilton of his Miranda rights and attempted to interrogate him; Gilton unequivocally invoked his right to an attorney.
Gilton then was taken to county jail and placed in a holding cell. Around 2:30 a.m. on July 5, a deputy sheriff removed Gilton from the cell and asked whether he was a gang member. The deputy did not advise Gilton that he was free to return to his cell without answering or to have a lawyer present; nor was Gilton informed that his answers could be used to incriminate him. In response to the deputy’s inquiry wheth *1146 er he was affiliated with the Fillmore/Central Divisadero Playas (“CDP”) gang, Gil-ton said, ‘Yeah, I hang out there, put me where I’m from.”
Gilton’s answers were entered by the deputy on two forms used by jail officials in determining where to house inmates— an “Information Report,” which designates any gang affiliation, and a “Class Interview,” which reflects whether the prisoner presents any “High Risks,” including being a gang member. The deputy designated Gilton a gang member on the Information Report, and checked off “Gang Member” on a list of “High Risks” on the Class Interview. Absent a direct admission of gang affiliation, a prisoner can still be designated a gang member on the forms if two other criteria are met—including a gang-related tattoo, a prior gang-related arrest, frequent association with validated gang members, or police intelligence that he is a gang member. In classifying Gilton, the deputy relied not only on his responses to questioning, but also on his arrest record and police intelligence.
Gilton was initially charged in state court with murder, conspiracy to commit murder, discharge of a firearm at an occupied motor vehicle, and possession of a firearm by a felon. In November 2013, he was indicted by a federal grand jury and the state charges were dismissed. A superseding indictment charged Gilton with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. § 1962(d), murder in aid of racketeering for the murder of Calvin Sneed, 18 U.S.C. § 1959(a)(1), and related firearms offenses. An element of the RICO count is Gilton’s membership in a RICO enterprise—here, the CDP gang. See 18 U.S.C. § 1962(c), (d).
Gilton moved to suppress the statements made to the deputy about gang affiliation. The district court granted the motion, holding that because “asking about Gilton’s gang affiliation was reasonably likely to elicit incriminating information,” the so-called “booking exception” to Miranda did not apply. This timely appeal followed.[1] See 18 U.S.C. § 3731 (allowing appeal of order granting motion to suppress).
II.
Under the iconic rule of Miranda v. Arizona, “the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.” 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). “Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.” Id. Once the defendant “indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.” Id. at 444-45, 86 S.Ct. 1602. “[UJnless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.” Id. at 479, 86 S.Ct. 1602.
“[T]he term ‘interrogation’ under Miranda refers ... to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating *1147 response from the suspect.” Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The so-called “booking questions exception” exempts “from Miranda’s coverage questions to secure the biographical data necessary to complete booking or pretrial services.” Pennsylvania v. Muniz, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (plurality opinion) (quotation marks omitted) (concluding that the answers to questions regarding the defendant’s name, address, height, weight, eye color, date of birth, and current age were admissible in the absence of Miranda warnings); see id. at 608, 110 S.Ct. 2638 (assuming the existence of a “routine booking qúestion” exception but finding it “unnecessary to determine whether the questions fall within” it) (Rehnquist, J., concurring). Because such questions “rarely elicit an incriminating response, routine gathering of biographical data does not constitute interrogation sufficient to trigger' constitutional protections.” United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990).
The booking questions exception, however, is subject to an important qualification: “When a police officer has reason to know that a suspect’s answer may incriminate him, however, even routine questioning may amount to interrogation.” United States v. Henley, 984 F.2d 1040, 1042 (9th Cir. 1993). Thus, we have consistently emphasized, consistent with Innis, that “the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response.” United States v. Booth, 669 F.2d 1231, 1238 (9th Cir. 1981); see United States v. Washington, 462 F.3d 1124, 1132-33 (9th Cir. 2006) (applying Booth). Thus, for example, when there is reason to suspect that a defendant is in the country illegally, questions regarding citizenship do not fall under the booking exception—even if they are biographical—because a response is reasonably likely to be incriminating. See Gonzalez-Sandoval, 894 F.2d at 1047; United States v. Mata-Abundiz, 717 F.2d 1277, 1280 (9th Cir. 1983); see also Henley, 984 F.2d at 1042 (“[W]hile there is usually nothing objectionable about asking a detainee his place of birth, the same question assumes a completely different character when an INS agent asks it of a person he suspects is an illegal' alien.”).
The government insists that the deputy who asked about Gilton’s gang affiliation could not have known that a response was reasonably likely to be incriminating, because no gang-related charges were then pending. But, “[t]he test is an objective one; the subjective intent of the police is relevant, but not conclusive.” Washington, 462 F.3d at 1132. The absence of specific gang-related charges does not mean that questions regarding the gang affiliation of a defendant arrested for a violent crime are not likely to prove incriminating. As a unanimous California Supreme Court recently noted, gang membership exposes a defendant to “a comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs.” People v. Elizalde, 61 Cal.4th 523, 538, 189 Cal.Rptr.3d 518, 351 P.3d 1010 (2015).
The California Street Terrorism Enforcement and Prevention Act created a substantive offense, section 186.22(a), which punishes as a misdemeanor or felony “any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that *1148 gang.” Subdivision (b)(1) of that section imposes greater punishment when a felony is committed “for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.” The additional punishment can be substantial.
Section 12022.53 provides enhancements for 'personal use or discharge of a firearm. Its provisions apply to any principal when the offense is committed to benefit a criminal street gang.
Finally, in 2000 the voters passed Proposition 21, which added intentional gang-related murders to the list of special circumstances authorizing penalties of death or life without the possibility of parole. It also created the crime of conspiracy to commit a felony by active street gang participants.
Id. at 538-39, 189 Cal.Rptr.3d 518, 351 P.3d 1010 (alterations, citations, and quotation marks omitted).
Gang membership may also expose a defendant to federal criminal liability. For example, a defendant’s sentence for a federal drug crime or crime of violence is increased by ten years if he “participates in a criminal street gang with knowledge that its members engage in or have engaged in a continuing series of’ violent or drug offenses or “intends to promote or further the felonious activities of the criminal street gang.” 18 U.S.C, § 521(d)(1), (2). The federal sentencing guidelines note that “an upward departure may be warranted” “[i]f the defendant is subject to an enhanced sentence” under § 521. U.S. Sentencing Guideline Manual § 5K2.18 (U.S. Sentencing Comm’n 2015). And—as here—gang membership can give rise to RICO charges when the gang is alleged to be an “enterprise.” See 18 U.S.C. §§ 1961(4), 1962.
The risk that information about gang affiliation will prove incriminating is even greater when a defendant is charged in California with murder, a crime that the state’s ^Supreme Court has acknowledged is “frequently committed for the benefit of criminal street gangs.” Elizalde, 61 Cal.4th at 540,189 Cal.Rptr.3d 518, 351 P.3d 1010. When, the deputy asked Gilton about his gang membership, he had already been arrested on charges of murder, conspiracy to commit murder, discharge of a firearm at an occupied motor vehicle, and possession of a firearm by a felon. Questions about Gilton’s gang affiliation were thus reasonably likely to elicit an incriminating response, even if the federal RICO charges had not yet been filed. See People v. Elizalde, 166 Cal.Rptr.3d 16 (Cal.App. 2013) (holding statements regarding gang affiliation inadmissible when officer who asked defendant about his gang affiliation for housing purposes was “aware that [the defendant] had been charged with murder” but not that it was gang-related), aff'd, 61 Cal.4th 523, 189 Cal.Rptr.3d 518, 351 P.3d 1010 (2015).
The government’s assertion that such questions are posed routinely,[2] and that the deputy asked the questions for a non-investigatory purposé, does not alter our conclusion. “The test is an objective one, however, and thus the subjective intent of the police, while relevant, is not conclusive.” Booth, 669 F.2d at 1238. And, the objective inquiry is simple: Under the circumstances, are questions about gang affiliation reasonably likely to produce an incriminating response? In a case involving Medicare fraud, they are not. But when murder is the charge, the questions—even *1149 if asked for administrative purposes—are reasonably likely to elicit incriminating information.
The government argues that this case is controlled by Washington, in which we held that an officer’s question about a defendant’s gang nickname was “routine gathering of background information” that did not rise to the level of interrogation. 462 F.3d at 1133. The defendant in Washington argued that his response was likely to be incriminating because it might be used to identify him as having committed the charged robbery. We rejected that argument because, taken “to its logical conclusion, any time an informant uses a particular name to identify the person who committed a crime, it would be impermissible interrogation for the police to ask the suspect his name because confirming his identity would be ‘incriminating.’ ” Id. We noted that in most cases “simply asking for a suspect’s name” or its equivalent is not likely to produce an incriminating response, and even if identification “may help lead to the prosecution of that person for a crime,” a person’s identity alone, is not protected by the Fifth Amendment’ Id.
But this is far different case. As discussed above, a defendant charged with a violent crime in California who is a gang member is subject to far greater jeopardy than those who are not gang members. And, the same is true under federal law. Seeking information about gang membership is thus far more likely to produce an incriminating response than inquiring about a defendant’s nickname.
The government also attempts to invoke the “public safety exception” to Miranda articulated in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In Quarles, a rape victim approached police officers, described her assailant, stated that he was armed with a gun, and said that he had just entered a grocery store. Id. at 651-52, 104 S.Ct. 2626. An officer approached the suspect in the store, frisked him, and found that “he was wearing a shoulder holster which was then empty.” Id. at 652, 104 S.Ct. 2626, The officer asked him where the gun was, the suspect responded; the officer immediately retrieved the loaded gun, placed the suspect under arrest and read him his Miranda rights. Id.
The Court held that, “on these facts there is a ‘public safety’ exception to the requirement that Miranda warnings be given.” Id. at 655, 104 S.Ct. 2626. The police “in the very act of apprehending a suspect, were confronted with the immediate. necessity of ascertaining the whereabouts of a., gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket.” Id. at 657, 104 S.Ct. 2626. .The Court concluded, that in such a “kaleidoscopic situation .... where spontaneity rather than adherence to a police manual is necessarily the order of the day,” officers should not be placed “in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.” Id. at 656, 657-58, 104 S.Ct. 2626.
 “In determining whether the public safety exception to Miranda applies, we ask whether there was an objectively reasonable need to protect the police or the public from any immediate danger.” United States v. Carrillo, 16 F.3d 1046, 1049 (9th Cir. 1994) (quotation marks omitted) *1150 (holding that asking a defendant whether he had any drugs or needles on his person-prior to a body search—fell within the exception as it “stemmed from an objectively reasonable need to protect [the officer] from immediate danger”); see also United States v. Brady, 819 F.2d 884, 887-88 (9th Cir. 1987) (applying public safety exception to a question whether defendant had a gun in his car because the officer “had to control a dangerous situation” in which a crowd had gathered and the defendant’s car “stood with its door open and the keys in the ignition”). There was no such danger here. The deputy retrieved Gilton from a locked holding cell around 2:80 a.m.—hours after Gilton arrived at the jail. There was no “kaleidoscopic situation,” nor was the deputy put to the Hob-son’s choice of deciding within seconds whether society was best served by asking the questions without a Miranda warning or giving such a warning and damaging his ability to neutralize a “volatile situation.” Quarles, 467 U.S. at 656, 658, 104 S.Ct. 2626. That the questions may have been asked in the general interests of inmate safety does not mean that there was an urgent need to protect either the deputy or others against immediate danger; the narrow “public safety exception” therefore does not apply.
III.
For the reasons above, we affirm the district court’s suppression order. But, it is also important to note what we do not hold. We do not hold that prison officials may not inquire into a prisoner’s gang membership in the interests of inmate safety. See, e.g., Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 132 S.Ct. 1510, 1518, 182 L.Ed.2d 566 (2012) (“Gang rivalries spawn a climate of tension, violence, and coercion.”) (quotation marks omitted). Nor do we hold that the responses to such questions cannot be used for purposes of inmate housing. Rather, we hold only that when a defendant charged with murder invokes his Miranda rights, the government may not in its casein-chief admit evidence of the prisoner’s unadmonished responses to questions about his gang affiliation.[3]
AFFIRMED.

. The district court also suppressed photographs seized from Gilton’s home. The government does not challenge that ruling on appeal.

. The record contains no evidence about how frequently the gang questions are asked, or how the decision is made whether to make the inquiry in a particular case.

. The government does not suggest that the deputy was otherwise unable to secure information needed to house Gilton safely. Indeed, even had Gilton refused to answer the questions, he apparently would nonetheless have been classified as a member of CDP on the basis of his arrest record and officer intelligence.