Filed 11/5/25  P. v. Velasquez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062811 |
| v. | (Super. Ct. No. 20CF2992) |
| AGUSTIN VELASQUEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Patrick H. Donahue, Judge. Reversed and remanded.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Agustin Velasquez of murder and other offenses. Velasquez asserts the trial court should have granted his motion to suppress his interrogation statements because he invoked his right to counsel under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and because his statements were involuntary and coerced. We agree and further conclude the admission of the interrogation was prejudicial. We therefore reverse his convictions and remand for retrial.

FACTS

I.

THE MURDER

In January 2017, then 20-year-old Velasquez was enlisted by Charles Coghill—an errand runner for California prison inmate Gregory "Lou" Munoz—to go collect money from known drug dealer Robert Rios. Coghill teamed Velasquez with two older men, 36-year-old Ricardo Valenzuela and 31-year-old Ysrael Cordova. Coghill armed the three recruits with guns, dropped them off near Rios's house in Placentia shortly before midnight, and waited nearby.

Seeing unfamiliar armed men on his home video surveillance, Rios walked outside and a confrontation ensued. Velasquez struck Rios in the back of the head, knocking him to the ground, and the other men entered Rios's house. In their absence, Rios stood up and tackled Velasquez, and the other men quickly returned outside. Moments later, Cordova fatally shot Rios and also accidentally shot Velasquez in the leg with a Mac-10 assault rifle. The entire encounter lasted about one minute.

Velasquez and the other two recruits fled to Coghill's car, and the four men sped away. Instead of taking Velasquez to a hospital, Coghill left him bleeding on a street curb.

Velasquez called his best friend John, who picked him up and drove him to a hospital in Oceanside for treatment of his gunshot wounds. Velasquez underwent surgery, and his leg was in a cast for over a month.

During his hospital stay, San Diego Sheriff's deputies interviewed Velasquez about his gunshot wounds. Velasquez claimed he and John had been driving home from a party, he got out of the car to urinate on the side of the road, and a Black male robbed and shot him. John later showed the deputies the location where the shooting supposedly occurred, but multiple searches yielded no supporting evidence.

## II.

### THE ARREST AND INTERROGATION

In the months that followed, law enforcement arrested Coghill, Cordova, and Valenzuela in connection with Rios's murder, and they also identified Velasquez as a suspect. Cell phone records tied Velasquez to his cohorts and to the crime scene. And the clothing Velasquez was wearing on the night of the robbery, which was collected as evidence at the hospital, had a bloodstain containing DNA consistent with Rios's DNA.

After locating him, Anaheim police rear-ended the car Velasquez was driving and arrested him at gunpoint. He was then transferred to the Placentia Police Department for questioning by Sergeant B. Angel and Detective J. Reger.

Angel first asked Velasquez a series of "medical and booking questions" while filling out the booking paperwork. During their conversation, Velasquez repeatedly asked why he was under arrest, and Angel responded that Reger would explain everything after the booking paperwork had been completed. Velasquez replied, "I'm not going to answer

3

any more booking questions until I have an attorney then." Angel paused his questions.[1]

Angel moved Velasquez into an interview room, the walls of which were covered with photographs from the murder investigation and of Velasquez in the hospital. Reger was waiting there. From this point onward, Velasquez's discussion with the officers was recorded. Angel did not tell Reger that Velasquez had just asked for an attorney.

Velasquez sat down and asked the officers how they got the photographs. Reger told Velasquez, "All I want you to do is listen," "I'm not going to ask any questions," and "I just want you to hear me."

Reger then shared some information about the investigation of the murder. Pointing to the photographs of Coghill and his cohort, he said: "we have, let's see, one, two, three, four different people up here and a vehicle and . . . the pictures of you in the hospital." Velasquez attempted to interject some questions, but Reger reminded him to "[l]et me just talk."

Pointing to the photographs, Reger went on: "[Y]ou're the last one of four people. . . . Jail, jail, jail, and you today. Okay?" He then listed the evidence the police had already collected about Velasquez: "I know that you've been arrested before. I've seen your [c]riminal [h]istory and all that. [¶] . . . [¶] I know you're from Anaheim. I know you go by Boogey. I know you posted two days ago on Facebook. I know that you go by AVay . . . on Facebook." Velasquez confirmed he used his initials in his Facebook name.

---

[1] This information comes from Angel's typed summary of the interview, which he prepared four days later. The parties stipulated to the report's accuracy. The conversation was not recorded.

Reger continued: "I also know you were involved in something in the City of Placentia on January 19th of this year. Okay? And this is where I got these photographs. What you guys didn't know is the location you were at . . . had a surveillance system. Okay? And so, that's how I got [those photographs] . . . . Okay? So, the place where you guys were at had cameras up."

Velasquez interjected that the police were "making it seem like [he] was there" and asked if they were "accusing [him] of something." At that point, Reger read Velasquez his *Miranda* rights, and Velasquez indicated he understood. He did not repeat his request for an attorney, and instead asked, "what's going on?"

Reger and Angel interviewed Velasquez for the following three hours. For most of the interview, Velasquez denied any involvement in Rios's death and insisted, as before, that he had been shot in the leg by a Black man during an attempted robbery in San Diego.

Throughout the interview, Reger and Angel repeatedly told Velasquez he was facing "life in prison" or possibly "capital punishment" or "the death penalty. " They added that "cooperation can affect outcomes" and a key question in court will be whether he was "cooperative" or "stone-walled" them. They also threatened delayed prosecution: they noted his trial would not start for two or three years (possibly longer), intimated this was his one and only chance to "come clean," and said "the DA [we're] working with doesn't" allow that "down the road." Velasquez repeatedly acknowledged he was "scared" of the prospect of life in prison.

The officers then told Velasquez that if he refused to cooperate, his best friend John could be arrested and prosecuted as an "accessory to murder," for aiding and abetting a felon, for helping Velasquez "escape and

5

evade" law enforcement, and for filing a false police report. They said John could do "serious time" because Velasquez got him involved. Angel threatened to "arrest [John] unless you tell us otherwise," and Reger claimed he had "discretion" whether to file a case against John.

The officers also noted that John has a daughter and wants to be a fireman, but fire departments "don't hire felons last time I checked." They added that because John's false police report required multiple people to do "all that work" and investigate a shooting that did not happen, John would "have to pay for every cops' fucking salary [and] every CSI fucking technicians' salary" and overtime pay in San Diego. In Reger's words, the authorities in San Diego were "just itching to come up here and fucking burn John," and John was "gonna burn for this, man."

Velasquez began to cry and said he would be "willing to do life for this guy." He then asked, "You want to give him life in prison?" In response, Reger encouraged Velasquez to "tell [his] story" and said Velasquez would then be allowed to call John and tell him not to lie for him.

At that point, now several hours into the interview, Velasquez commented: "I think you guys got all the evidence on me" and "You got me."

When pressed further, Velasquez requested to see more evidence, and the officers showed him the surveillance video of the robbery. In response, Velasquez confessed: "You got me. Pretty much. Right there, you got me." After further questioning, he admitted John took him to the hospital and they agreed to fabricate a story about how he had been shot.

### III.

#### CHARGES AND TRIAL

Velasquez was charged with conspiracy to commit robbery, first degree murder, attempted robbery, and first degree burglary, among other

6

things. On the latter three counts, he was charged with the personal use of a firearm (Pen. Code, § 12022.5, subd. (a)), and it was further alleged as a special circumstance that the murder was committed while Velasquez was engaged in the commission or attempted commission of a robbery (*id.*, § 190.2, subd. (a)(17)(A)).[2]

The defense moved to suppress Velasquez's police interview, asserting the officers violated *Miranda* and then coerced his confession. The trial court denied the motion, and a mildly redacted version of the interview recording was played for the jury.

The defense tried to show Velasquez believed he was going to Rios's house on a routine errand involving the collection of money or drugs owed, and the errand turned unexpectedly tragic when Rios was fatally shot. During his lengthy trial testimony, Velasquez maintained he only agreed to participate because the group was just planning on getting money owed; he did not think there would be a shooting; the guns were just meant to scare someone; he did not intend to participate in a robbery or murder; and he had no idea that was the plan. He further maintained it was *Coghill* (not Cordova) who shot Rios. According to Velasquez, when he last saw Rios, Rios had not yet been shot, and while Velasquez was waiting in the car, Coghill returned to the yard and shot Rios twice.

---

[2] Velasquez was also charged with various gang-related charges and enhancements. However, as a sanction for the People's gang expert's untruthful testimony at the preliminary hearing, the trial court struck those charges and enhancements and suppressed most evidence regarding gangs or the Mexican Mafia. (See *Stanton v. Superior Court* (1987) 193 Cal.App.3d 265.)

Velasquez was also questioned about certain photographs and videos of guns found on his cell phone, which the trial court admitted over his objection. Velasquez offered various explanations about how the photographs ended up on his phone.

The jury convicted Velasquez on all counts and found true the firearm enhancement and special circumstance. Velasquez filed a motion for new trial, followed by a *Pitchess* motion for discovery regarding two Sheriff deputies' potential misconduct and their destruction of evidence in a separate case involving Munoz. The trial court denied Velasquez's motions and sentenced him to life in prison without the possibility of parole for the murder, plus a three year determinate sentence.

DISCUSSION

I.

THE AUTHORITIES VIOLATED VELASQUEZ'S *MIRANDA* RIGHTS

*A. Controlling Law*

In *Miranda*, our Supreme Court held that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda, supra*, 384 U.S. at p. 444.) Among those safeguards is the express "right to have counsel present" during a custodial interrogation. (*Id.* at p. 469.) *Miranda* described this right as "indispensable." (*Ibid.*) If a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." (*Id.* at pp. 444–445.)

A custodial interrogation can come in various forms and does not require questions. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the

8

police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 (*Innis*).) "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." (*Id.* at pp. 300–301.)

Conversely, "not all questions constitute interrogation." (*Martinez v. Cate* (9th Cir. 2018) 903 F.3d 982, 993.) *Miranda*'s safeguards do not apply when police ask a suspect "'routine booking question[s]' . . . to secure the "'biographical data necessary to complete booking or pretrial services.'"" (*Pennsylvania v. Muniz* (1990) 496 U.S. 582, 601 (*Muniz*) [questions about defendant's name, address, height, weight, eye color, date of birth, and age].) "Because such questions 'rarely elicit an incriminating response, routine gathering of biographical data does not constitute interrogation sufficient to trigger constitutional protections.'" (*United States v. Williams* (9th Cir. 2016) 842 F.3d 1143, 1147 (*Williams*).)

But there is an exception to that exception: "[courts] have 'recognize[d] the potential for abuse by law enforcement officers who might, under the guise of seeking "objective" or "neutral" information, deliberately elicit an incriminating statement from a suspect.'" (*United States v. Zapien* (9th Cir. 2017) 861 F.3d 971, 975.) Thus, the booking questions exception "is subject to an important qualification: 'When a police officer has reason to know that a suspect's answer may incriminate him, . . . even routine questioning may amount to interrogation.'" (*Williams, supra*, 842 F.3d at p. 1147.)

For example, in a murder case, questions about gang affiliation, even if asked for administrative purposes, do not fall within the booking

9

exception if reasonably likely to elicit incriminating information. (*Williams, supra,* 842 F.3d at p. 1148–1149; *People v. Elizalde* (2015) 61 Cal.4th 523, 527 (*Elizalde*).) "When booking questions go beyond the basic biographical data contemplated in *Muniz,* the core concerns of *Miranda* and *Innis* are implicated." (*Elizalde*, at p. 536; see, e.g., *Williams*, at p. 1147 [if defendant may be in the country illegally, questions regarding citizenship do not fall under booking questions exception if response may be incriminating].)

Critically, once a suspect states he wishes to consult with an attorney, the interrogation must stop until an attorney is present or the suspect reinitiates contact. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484–485 (*Edwards*).) "This is a bright-line rule: It requires all questioning cease after a suspect requests counsel." (*People v. Johnson* (2022) 12 Cal.5th 544, 580 (*Johnson*).)

An officer may not circumvent a suspect's invocation of his right to counsel by taking a short break and then having a colleague approach the suspect, advise him of his *Miranda* rights, and reinitiate questioning. (*Edwards, supra,* 451 U.S. at p. 487 [officers wrongly questioned suspect the day after he invoked his right to counsel with another officer].) Once "an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [An accused who has] expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Id.* at pp. 484–485.)

10

This is a "prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." (*Michigan v. Harvey* (1990) 494 U.S. 344, 350.) "'In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching"—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.'" (*People v. Henderson* (2020) 9 Cal.5th 1013, 1022 (*Henderson*).)

"'If further conversations are initiated by the police when there has not been a break in custody, the defendant's statements are presumed involuntary and inadmissible as substantive evidence at trial.'" (*Johnson, supra,* 12 Cal.5th at p. 578.) This is true "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 177.)

"We review *Miranda* claims under federal constitutional standards." (*Johnson, supra,* 12 Cal.5th at p. 578.) "'"[W]e accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*."'" (*Henderson, supra,* 9 Cal.5th at p. 1023.) "When 'an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.'" (*People v. Suarez* (2020) 10 Cal.5th 116, 158.)

*B. Application*

Because the parties stipulated to the accuracy of Angel's report about the booking process, and because the rest of the interrogation was recorded, our review is de novo. After independently reviewing the record, we

11

conclude Velasquez's statements were obtained in violation of *Miranda* and its progeny.

At the beginning of his interrogation, Velasquez told Angel, "I'm not going to answer any more booking questions until I have an attorney." This was a clear and unambiguous invocation of his right to counsel, so all questioning should have ceased at that point. (*Edwards, supra,* 451 U.S. at pp. 484–485.) As a different panel of this court noted, "Once a suspect invokes the right to counsel, everything changes; that is, the police can no longer engage in efforts to convince the suspect to speak to them." (*People v. Avalos* (2022) 85 Cal.App.5th 926, 932 (*Avalos*).)

Although Velasquez asked for an attorney to be present while he answered "booking questions," we do not view his demand for counsel to be ambiguous or unclear. "A request for counsel need not be stated as a model of eloquence and clarity in order to qualify as an unequivocal invocation of the right to counsel." (*Alvarez v. Gomez* (9th Cir. 1999) 185 F.3d 995, 997.) And it would be nonsensical to assume Velasquez only wanted counsel present for questions about his biographical data but not about his possible involvement in the crime, particularly since minutes earlier he had been arrested at gunpoint after officers rear-ended his car. In any event, if Angel believed Velasquez's invocation was somehow ambiguous due to his reference to "booking questions," he had a duty "to clarify any ambiguity before beginning general interrogation." (*U.S. v. Rodriguez* (9th Cir. 2008) 518 F.3d 1072, 1080.)

We recognize Velasquez invoked his right to counsel while Angel was still ostensibly booking him and before he was brought into the interview room. *Miranda* generally is not triggered when the police are asking routine booking questions to secure biographical data needed for booking, because

such questions rarely elicit an incriminating response. (*Muniz, supra*, 496 U.S. at p. 601; see also *People v. Avila* (1999) 75 Cal.App.4th 416, 418 [anticipatory invocation of *Miranda* before custodial interrogation begins is "meaningless"].)

In this case, however, Angel *also* asked Velasquez medical questions that could tie him to the crime. Velasquez was shot in the leg during the commission of the crime just three months earlier, hospitalized for a notable period, and then interviewed and photographed by authorities while in the hospital. Indeed, moments later the police showed Velasquez photographs of himself in the hospital. The medical questions might well elicit incriminating information. As such, the so-called booking phase of the interview amounted to a custodial interrogation. (*Williams, supra*, 842 F.3d at p. 1147.)

Because Velasquez invoked his right to counsel during a custodial interrogation, the questioning should have stopped there. It did not. Instead, Angel continued that custodial interrogation by moving Velasquez into the interview room, the walls of which Reger had covered with photographs from the murder investigation and of Velasquez in the hospital. Further, Angel did not inform Reger that Velasquez had just asked for an attorney.

Despite Velasquez's request for an attorney, Reger proceeded to inform Velasquez that the police knew all about his criminal history and social media posts; that surveillance cameras caught him and his cohorts committing the crime; and that the three other individuals involved were already in jail. *Miranda* extends to "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Innis, supra,* 446 U.S. at p. 301;

13

see, e.g., *United States v. Poole* (9th Cir. 1986) 794 F.2d 462, 466–467 [by showing suspect surveillance photographs of bank robberies and mentioning his accomplice by name, FBI agent "in effect accused Poole of the robberies"].) By subjecting Velasquez to the functional equivalent of questioning after he expressly invoked his right to counsel, the officers crossed a line.

We recognize Reger *then* read Velasquez his *Miranda* rights, and Velasquez indicated he understood and did not repeat his request for an attorney. However, because Velasquez had previously invoked his right to counsel, and because his subsequent waiver of his right to counsel was secured by police-initiated conversation, the waiver is presumed invalid. (*Edwards, supra,* 451 U.S. at p. 484 [responding to further police-initiated custodial interrogation after invoking right to counsel, even if advised of rights, does not establish valid waiver of right to counsel]; *Johnson*, *supra,* 12 Cal.5th at p. 578 [statements made after asserting right to counsel presumed involuntary if police initiated further conversations with no break in custody].) Thus, the entirety of the interrogation was inadmissible as substantive evidence at trial.

## II.

### VELASQUEZ'S RESPONSES WERE COERCED

We further conclude Velasquez's responses to questioning were involuntary and coerced because they were produced by threats of the death penalty or life in prison, followed by threats to ruin his best friend John.

The prosecution must establish by a preponderance of the evidence that the defendant's confession was voluntary, and we consider the totality of the circumstances in determining whether it met that burden. (*People v. Flores* (2020) 9 Cal.5th 371, 426.) ""A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied

14

promises, or secured by the exertion of improper influence.”’” (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) An involuntary confession is inadmissible for any purpose, including impeachment. (*People v. Neal* (2003) 31 Cal.4th 63, 85 (*Neal*).) Where, as here, the interview is recorded, we independently review whether the confession was voluntary. (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1401.)

We conclude Velasquez’s confession was coerced and involuntary, despite the officers’ generally calm tone during the interrogation. They used multiple types of threats, accompanied by implied promises of lenity, to secure Velasquez’s eventual admissions. (See *People v. Dykes* (2009) 46 Cal.4th 731, 752 [statement is involuntary if extracted by threats or obtained by direct or implied promises].)

First, the officers raised the possibility of a life sentence or the death penalty eight to 10 times:

    i.    Reger: “[T]his [case has] a capital punishment attached to it. Okay?

    ii.    Reger: “Meaning . . . [this case] could lead up to the death penalty.”

    iii.    Reger: “Do you want to spend the rest of your life in prison[?] -- [¶] . . . [¶] -- because that’s the way it’s going.”

    iv.    Angel: “You’ve been arrested for murder. Capital murder.”

    v.    Reger: “You’re never going to see the light of day, man.”

    vi.    Reger: “[T]oday was the last day you’re going to step foot outside of a jail or prison.”

    vii.    When asked, “You’re telling me I’m going life in prison?”, Reger responded: “With the possibility of the death penalty; yes.”

15

viii.   When again asked minutes later, "You're telling me I'm doing life in prison?," Reger answered: "Right."

ix.   Reger: "And you're not scared of actually doing life in prison?"

The officers also threatened delayed prosecution: they noted Velasquez's trial would not start for at least two or three years (possibly longer), and in the meantime he would be stuck in jail. They further suggested this was his one and only chance to "come clean" and said neither the police nor "the DA [we're] working with" would allow that "down the road."

When threats of capital punishment did not yield a confession, the officers threatened to go after Velasquez's best friend John. They said they would prosecute John for various felonies and seek financial reimbursement from him for the costs associated with the San Diego investigation unless Velasquez told them what really happened. By this point, Velasquez was reduced to tears. Minutes later he confessed.

Although "a threat to arrest or prosecute a relative is not coercive when the police have probable cause to believe the relative has committed a crime" (*People v. Jimenez* (2021) 73 Cal.App.5th 862, 878 (*Jimenez*)), the officers here did more than just truthfully describe John's predicament. They falsely implied he could be on the hook for the murder, in their discretion, and subject to a life sentence. They also made veiled threats to ruin John's financial stability and aspirations of becoming a fireman unless Velasquez confessed. Taken together, these threats against both Velasquez and his best friend, accompanied by implied promises of lenity, show his eventual confession was coerced.

16

In arguing the statements were voluntary, the Attorney General relies on *People v. Williams* (2010) 49 Cal.4th 405, in which our Supreme Court held that an interrogator's references to the death penalty do "not necessarily" render a confession involuntary. (*Id.* at pp. 437, 443 [defendant's will was not overborne by detective's statement that the truth could protect him from "'*life in prison . . . or the gas chamber*'"].) But in *Williams*, it was "evident that neither the mention of the death penalty nor the [officer's] deception overcame defendant's will. He exhibited no sign of distress in response to references to the death penalty, and remained able to parry the officers' questions." (*Id.* at p. 443.) Here, by contrast, Velasquez said at least three times during the interview that he was afraid of life in prison, and he was ultimately reduced to tears by the threats concerning John. Because Velasquez's statements were plainly motivated by a strong desire to avoid a life sentence or capital punishment and to save his best friend, they should have been excluded as involuntary.

III.

THE ADMISSION OF THE INTERROGATION WAS PREJUDICIAL

Our analysis does not end there. We must consider whether the interrogation's erroneous admission was prejudicial under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Elizalde, supra,* 61 Cal.4th at p. 542 [*Miranda* violation]; *Jimenez, supra*, 73 Cal.App.5th at p. 882 [coerced confessions].) That test requires the People "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman,* at p. 24.)

"The *Chapman* test is a challenging burden for the prosecution: 'The test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but

17

whether there is *any reasonable possibility* that the error *might have* contributed to the conviction in this case. *If such a possibility exists*, reversal is required.'" (*Avalos, supra,* 85 Cal.App.5th at p. 953.) "That is, the presumption is that we must reverse, *unless* the prosecution proves the error was harmless beyond a reasonable doubt." (*Ibid.*)

The Attorney General insists any error was harmless because other evidence provided ample support for Velasquez's convictions. This argument has initial appeal. It seems beyond dispute that Velasquez was at the scene of the murder and took part in the ambush; the surveillance footage, cell phone records, and DNA evidence confirm as much.

But that other evidence does not speak to some of the most heavily litigated issues at trial—whether Velasquez was a major participant in the robbery and acted with reckless indifference to human life. His defense to all charges depended on his state of mind and convincing the jury he played no role in planning and had no reason to expect violence.

The admission of the interrogation was significant because it enabled the prosecution to cast doubt on Velasquez's professed claims of innocence and assail his credibility. For example, Velasquez lied during his interrogation about the source of his gunshot wound, repeatedly insisting he had been shot by a Black man in San Diego. He also failed to give an audible response when the officers asked him, "Were you guys supposed to go kill him?" The prosecutor repeatedly referenced those segments of the interrogation in his closing argument to cast doubt on Velasquez's credibility, asserting his lack of an audible response during the interrogation was an adoptive admission. (See *Avalos*, *supra*, 85 Cal.App.5th at p. 953 [prosecutor's closing arguments are particularly important in *Chapman* analysis of *Miranda* error].)

18

The officers also embedded statements in their interrogation questions that made it easier for the jury to conclude Velasquez was an experienced criminal who knew exactly what he was doing. For example, the officers noted Velasquez had "been arrested before" and had a "[c]riminal [h]istory," and they got him to admit he regularly smoked marijuana. They also repeatedly insinuated he was in a gang: they accused him of being "a fucking gang member" and of trying to "make a name for [his] gang," referenced photographs of him throwing up Folks hand signs, suggested the victim was killed for not "paying taxes," and repeatedly referenced Velasquez's "homeboys."

Finally, it is reasonable to assume Velasquez would not have testified at trial had his statements been suppressed. (*People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1487; see *Neal, supra,* 31 Cal.4th at p. 87 [erroneous admission of confessions was not harmless because "[w]ithout the confessions, defendant would not have been impelled to testify"].) That is significant, because Velasquez's trial testimony that it was *Coghill* (not Cordova) who shot Rios presumably contributed to the jury's apparent finding that Velasquez was not credible.

In sum, the admission of the interrogation, juxtaposed with Velasquez's inconsistent trial testimony, allowed the prosecutor to argue Velasquez was a lying criminal who refused to cooperate with police. This made it more likely the jury would conclude that Velasquez was subjectively aware he and other violent gang members would be robbing an armed drug dealer, and that Velasquez was not a naïve 20-year-old who was induced by older, more sophisticated criminals to act without any meaningful appreciation of the dangers involved.

19

For these reasons, we conclude the People did not prove beyond a reasonable doubt that the admission of the interrogation did not contribute to the verdict. As there is a reasonable probability the erroneous admission of Velasquez's statements contributed to his convictions, reversal is required.

## IV.

### REMAINING ISSUES

Our decision to remand for retrial moots many of the remaining issues Velasquez raises on appeal. For example, we do not reach whether Velasquez was denied effective assistance of counsel; whether the trial court erred in refusing to allow the cross-examination of Coghill or Reger for Velasquez's *Brady* claim in his new trial motion; whether the court must rule on the Racial Justice Act discovery motion; or whether the court should hold an evidence preservation hearing regarding eventual parole eligibility.

*A. Substantial Evidence Challenge*

We do, however, consider Velasquez's argument that there is insufficient evidence that he was a major participant in the robbery and acted with reckless disregard for human life. We briefly reach this issue because, as Velasquez's counsel noted at oral argument, if there was insufficient evidence to support the murder conviction or robbery murder special circumstance, he should not be retried on those theories.

The Attorney General cites ample evidence that Velasquez was a major participant in the attempted robbery and acted with reckless disregard for human life. The testimony at trial established that Velasquez was part of the "crew" Munoz created to rob Rios; that Velasquez had a preexisting relationship with Coghill; that Velasquez and his cohorts armed themselves with high-powered firearms before going to Rios's house; that it was Velasquez who unlocked Rios's gate so his cohorts could enter the yard; that

20

when Rios came out to confront the visitors, Velasquez aimed his gun at Rios, detained him, and was the only person to use physical force against him before the shooting; and that Velasquez made no attempt to prevent the shooting or help the victim.

However, some of that evidence comes from Velasquez's own trial testimony—testimony that he likely would not have given but for the erroneous admission of his police interrogation into evidence. Thus, although we reject Velasquez's substantial evidence challenge, we note that if the case is retried on remand, the People cannot rely on Velasquez's interrogation, which should have been excluded as noted above.

B. *Photographic and Video Evidence*

We also consider Velasquez's argument concerning the admission of certain photographic and video evidence, as that issue may also recur on retrial. Velasquez contends the trial court abused its discretion and violated his right to a fair trial by admitting certain photographs and video clips of guns, which authorities downloaded from his cell phone on the day of his arrest. The photographs in question were taken in the months after the robbery and before his arrest. Defense counsel objected to the photographs' admission but was overruled. Forced to explain the presence of the photographs on his cell phone during his testimony, Velasquez offered various explanations about how the photographs ended up on his phone.

We discern no error in the admission of the photographs and videos. The trial court correctly allowed the prosecution to introduce a limited number of photographs of guns because they were circumstantial evidence that Velasquez was familiar with the types of guns used in the attempted robbery, rendering the photographs more probative than prejudicial. (Evid. Code, § 352.) Further, the court properly allowed the prosecutor to introduce

21

the photographs and videos as impeachment evidence. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 53.)

*C. The* Pitchess *Motion*

Finally, we also consider Velasquez's argument that the trial court erred in denying his *Pitchess* motion for discovery regarding two Sheriff deputies' potential misconduct and their destruction of evidence in a separate case involving Munoz. The trial court conducted an in camera review of the documents at issue and ultimately concluded there was nothing to disclose.

Velasquez asks us to independently review the documents the trial court reviewed in camera and determine whether the court abused its discretion in finding that there were no discoverable documents. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1232; but see *People v. Nguyen* (2017) 12 Cal.App.5th 44, 49–51 (unanimous conc. opn. of Bedsworth, Acting P. J.) [criticizing current *Pitchess* practices as making meaningful appellate review impossible].) We have independently reviewed the sealed reporter's transcript of the in camera proceedings, as well as the sealed files the court reviewed. We are satisfied the court complied with the necessary procedures and did not abuse its discretion in finding there was no information to disclose.

## DISPOSITION

Velasquez's convictions are reversed and the sentences vacated. The matter is remanded for retrial.


SCOTT, J.

WE CONCUR:


DELANEY, ACTING P. J.


GOODING, J.